# Wise v. Darneal et al.

(Decided June 18, 1929.)

V. I. CARTWRIGHT and S. S. SAMUELS for appellant.

PETER, LEE, TABB, KREIGER & HEYBURN for appellees.

OPINION OF THE COURT BY JUDGE LOGAN—Affirming.

The appellant instituted suit against the appellees, seeking to recover $1,266.90, which he alleged was unlawfully withheld from him by them, which money he had earned by selling newspapers on the streets in Louisville. The appellee Howard Stodghill was at the time of the trial business manager of the Courier Journal and the Louisville Times. At the time of the acts complained of, he was the circulation manager for these newspapers. The appellee John Darneal was the street circulation manager for the Louisville Times at the time. The appellee Ben Liebschutz was the street circulation manager for the Courier Journal at this time, and after his duties as "street man" for the Courier Journal, a morning paper, were completed he was a newsboy on the streets of Louisville.

Appellant alleged in his petition that between the dates of January 1, 1924, and June 30, 1924, he bought of the appellees not less than 450 copies of the Sunday Courier Journal on each Saturday night and disposed of the copies so purchased at 8 cents each; that his profit on each paper so sold should have been 3 cents, or $351.

114

But the appellees, so he alleged, by force and duress and threats of refusing to allow him to sell any newspapers unless he complied with their demands, forced him to turn over to them all of his profits and gave him only the sum of $3 for each Saturday night that he sold papers, or a total of $78, and that he was thereby wrongfully deprived of $273.

He alleged that between the dates mentioned he bought of the appellees not less than 200 copies of the daily Courier Journal each day and disposed of the papers so purchased by him at 3 cents each, and that his profits should have been $3 per day, or a total of $468. The appellees, so he alleged, likewise by force and threats, deprived him of one-half of this sum, or $234.

He alleged that between December 1, 1924, and February 27, 1926, he bought of the appellees papers on each Saturday night, amounting to 230 copies of the Sunday Courier Journal, and disposed of these copies at 8 cents, and that his profits on the entire sale each night were $6.90, or a total of $455.40. But, so he alleged, the appellants took from him by force and duress all of said money except $2 for each Saturday night and that he was thus deprived of $323.40. He makes like allegations covering the period between December 1, 1924, and February 27, 1926, relating to the daily Courier-Journal, and alleged that through force and duress exercised by the appellees he was deprived of $323.40. He makes like allegations covering the last-mentioned period as to the daily Courier Journal and alleged that he was wrongfully deprived of $436.50 by the appellees.

There is this allegation in the petition: "Plaintiff states that a conspiracy exists between the defendants, Stodghill, Darneal and Liebschutz, to deprive this plaintiff and other newsboys of the full amount of their earnings by threats of bodily harm and threats of depriving them of their opportunity to sell the newspapers and thereby earn their livelihood and that a conspiracy exists between all of these defendants to keep this plaintiff and other newsboys from placing their complaints before the publisher and other high officials of the Courier Journal and thereby affording then an opportunity of rectifying the wrong done them and that by reason of this conspiracy of the defendants, this plaintiff has been deprived of his earnings in the sum of $1,266.90, which has been unlawfully taken and withheld from him by force and

threats of violence. Plaintiff further states that defendants, Darneal and Liebschutz are the ones that actually took and withheld from him the money and that defendant, Stodghill, while not actually taking or withholding from this plaintiff the money justly earned by him, by reason of aiding, abetting and conspiring with defendants, Darneal and Liebschutz, made it possible for them to prey upon newsboys and for this condition to exist over the long period of time hereinbefore stated.''

We shall endeavor to set out such facts as are necessary for the proper determination of the questions raised on this appeal. We find great difficulty in arriving at a conclusion as to what appellant had in mind at the time he filed his petition. It appears that the petition is an attempt to allege a conspiracy on the part of the appellees to deprive the appellant of money which he earned through the sale of the daily and Sunday editions of the Courier Journal. The petition does not seem to allege that there was any contract between appellees and the appellant relating to the sale of these papers. It appears that he claims that as a matter of right he was entitled to have the papers at a certain price and to sell them at any place available and to receive all of the profits, and that he was deprived of his profits by reason of an unlawful conspiracy existing among the appellees to coerce him into turning over to them a part of the profits.

The controversy arose over the sale of the ''Bulldog'' edition of the Courier Journal. The Sunday ''Bulldog'' is released for sale at 9 o'clock Saturday night, and the daily ''Bulldog'' is released for sale at the same hour on each of the other nights of the week except Sunday. We will not go into the great mass of evidence further than to say that the sale of newspapers on the corners of city streets has developed certain customs and usages recognized by all newsboys, and acquiesced in by the publishers and distributors of newspapers. The Courier Journal and the Times have been published in Louisville for many years. These papers were distributed by the street men; those in charge of the street circulation looking after the distribution of the papers. By a right similar to that of pre-emption, certain newsboys had certain street corners where they sold papers unmolested by others. Probably they were protected by the street circulation managers. When a boy had acquired the right to sell on a certain corner, other newsboys did not molest him or trespass upon his rights.

There is no disagreement on this point. It is a custom to sell a "corner," and, when one newsboy purchased a "corner" from another newsboy, the right to sell on that particular corner passes to the purchaser. The right may relate only to a particular edition of the paper, or to particular hours during the day or night, but whatever right one newsboy has he may pass it on by sale, barter, or trade.

The appellee Ben Liebschutz was not only the street circulation manager for the Courier Journal, but when his duties were over a short while before noon, the balance of the day was his, and he became one of the newsboys. He acquired in one way or another the right to sell on many of the principal street corners in the city. He seems to have had a monopoly on Fourth street from Main to Broadway.

It was not unusual for a newsboy having a street corner to grant another newsboy the privilege of selling on the same corner. Generally, the boy who was selling under such privilege divided his profits with the rightful occupant of the corner; at other times he paid so much for the privilege of selling on a corner for a certain part of the day or night. All of these things appear to have been well understood by the fraternity of newsboys.

Nothing happened to disturb the peace among the newsboys until the "Bulldog" was turned loose among them. There had been no Courier Journal in the evening; therefore no one had any rights in the corners to sell this particular edition. Ben Liebschutz, however, being alert, saw the opportunity to make money and he asserted the right to the street corners which were his for the sale of other editions. He did not take the corners by force, but through diplomacy and trades made with other newsboys.

When Stodghill became the business manager of the Courier Journal, Darneal was the "street man" for the Times, but he was also handling the Sunday "Bulldog" edition of the Courier Journal. He was receiving $4 each Saturday night for his work in distributing this edition. It was a very small edition at that time and probably there was little profit to the newsboys or others. Immediately after Stodghill became the business manager, he made an arrangement with Darneal whereby Darneal agreed to take the entire edition for distribution in the "down town district." The "downtown district" em-

braced that territory in the city bound by First street on the east, Main street on the north, Seventh street on the west, and Broadway on the south. Darneal was to accept and pay for the papers distributed in this district and he was responsible for the distribution. He was to pay what is termed a wholesale price for the papers. It was his duty to get the papers into the hands of the public. Liebschutz had made trades with a number of the boys whereby they were to work for him. The papers were delivered through Darneal, but Liebschutz made settlements with the boys. Some of them he paid a salary to sell the "Bulldog" edition on a particular corner; others he divided profits with, and others he allowed to sell and keep the profits for a certain fixed consideration to be paid in money. There is no evidence that there was any complaint on the part of boys about the arrangements made by Liebschutz except as will be later noted. Darneal and Liebschutz agreed that they would form a partnership. Darneal had the contract with the Courier Journal Company, and Liebschutz had a contract with a number of boys. Each one was to attend to his duties and they were to divide the profits.

These arrangements continued throughout the period referred to in the petition. The appellant makes no particular complaint in his evidence against anything that Liebschutz or Darneal did. He was a newsboy selling on the streets without any corner, making less than $1 a day on an average when Liebschutz took him up and put him to work, paying him $2 a night except Saturday nights, when he paid him $3. There is no complaint on the part of appellant that Liebschutz ever failed to pay him exactly what he agreed to pay. It is apparent that some of the boys who had traded with Liebschutz did become dissatisfied and made some complaint. The feeling probably was directed at Liebschutz more than any other, as it was he who had made arrangements to occupy the street corners. Appellant testified that he, in company with some other boys, went to see Mr. Stodghill and had a talk with him in or about his office, and that they were told that, if they did not like the way matters were being carried on by Darneal, they could give up their jobs. No one claims that he said anything more at that time. He stated that he was busy and was probably abrupt. The boys claimed that they were trying to get to Judge Bingham, the owner and publisher, but they made no further effort as far as this record discloses.

At the conclusion of the evidence the learned trial judge instructed the jury to return a verdict for appellees. We do not see how he could have done otherwise. There is no attempt to show a breach of any contract. Certainly, there is no evidence showing, or tending to show, a conspiracy. Mr. Stodghill testified, and he is not contradicted, that he knew nothing whatever of the arrangements under which the boys sold the papers. His entire connection with the matter was his making the contract with Darneal, which he certainly had a right to make, and his telling the boys if they did not like their jobs, they were at liberty to quit them. To charge a man with a conspiracy to rob boys without anything more upon which to base such a charge than is indicated by this evidence is a serious matter. Darneal bought the papers without any agreement on his part that he would furnish them to the newsboys at any particular price. This is not contradicted. He furnished most of the papers to Liebschutz, who had formed a partnership with him, and, so far as the record discloses, they paid the contract price for the papers. Darneal had nothing to do with the arrangements between the boys and Liebschutz. Liebschutz made contracts with them, which appear to have been not only to his advantage, but to the advantage of the appellant as well. If he violated no contract and did nothing that in any way injured appellant, on what ground could appellant hope to recover? There is no ground on which he could recover.

But it is claimed that the boys were forced to work for Liebschutz and Darneal against their will, as they feared that they could not obtain papers unless they acceeded to their demands. It is true that Darneal had control of the distribution of the papers, but he was under compulsion to sell the papers, and his success in the undertaking depended on his disposing of the papers. He was under necessity of placing the papers for sale with newsboys, and while it may be that the newsboys were under the necessity of purchasing from him, it appears that the necessities about balanced each other.

Counsel for appellant have raised many questions on their brief which we deem it unnecessary to discuss. A plain statement of the facts leads us to the same conclusion reached by the trial judge. There is no legal liability of appellees to the appellant.

Judgment affirmed.